1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    LARRY REUBEN CARRASCO,

11              Petitioner,              No. CIV S-04-1313 FCD GGH P

12         vs.

13    STUART RYAN, Warden, et al.,       FINDINGS AND RECOMMENDATIONS

14              Respondents.

15    _____/

16    I. Introduction

17              Petitioner, a state prisoner proceeding with appointed counsel, filed a petition

18    pursuant to 28 U.S.C. § 2254.   Although the court appointed counsel, this matter proceeds upon

19    the original pro se petition.[1]  Petitioner challenges his 2000 Sacramento County Superior Court

20    jury trial conviction and sentence for the following thirteen counts: count one, second degree

21    murder (Cal. Penal Code § 187(a)); count two, assault, resulting in the death of a child under age

22    eight (Cal. Penal Code § 273ab); count three, infliction of great bodily injury with intent to cause

23    cruel and extreme pain (torture) (Cal. Penal Code § 206); count four, infliction of cruel and

24    inhuman corporal punishment and injury upon a child (Cal. Penal Code § 273d(a)); counts five

25    _____

26         [1] Counsel for petitioner did not file an amended petition, supplemental points and
      authorities or a reply/traverse.

                                   1

through thirteen, willful infliction of harm or injury upon a child involving unjustifiable pain and suffering (Cal. Penal Code § 273a(a)).  Petition Form, pp. 1-2, Memorandum of Points and Authorities,[2] p. 1; Answer, pp. 1-2; Clerk's Transcript (CT), Vol. II, pp. 349-352.  Petitioner was sentenced to an indeterminate term of 25 years to life for count two, as well as to another indeterminate life term for the torture offense, as charged in count three.  Answer, p. 2, Lodged Document (Ldg. Doc.) 1.  Petitioner characterizes the sentence as "49 years to life plus an indeterminate life."  Petition Form, p. 1.  The Third District Court of Appeal set forth that petitioner was sentenced for second degree murder to a term of 15 years to life; for assault resulting in the death of a child to a term of 25 years to life; and for torture to an indeterminate life term, with sentences on all other counts stayed pursuant to Cal. Penal Code § 654.[3]  Petition, p. 1, Appendix A, March 20, 2002, Third District Court appeal decision, p. 8.

Petitioner raises the following grounds in his challenge: 1) ineffective assistance of trial counsel for having failed to investigate and provide evidence of the probable effects of drugs on petitioner's mental condition; 2) insufficient evidence that petitioner acted in conscious disregard of Alexia's life to support second degree murder conviction; 3) insufficient evidence of petitioner's intent to torture Jessica for a sadistic purpose to support a conviction of torture and infliction of great bodily injury; 4) prejudicial trial court error in instructing the jury on express malice (not charged), and by misinforming jury that it could ignore the conscious disregard element of implied malice murder; 5) violation of petitioner's constitutional rights to trial by jury and due process when jury instructed with CALJIC Nos. 1.00 and 17.41.1; 6) constitutional right to fair trial violated; 7) ineffective assistance of appellate counsel.  Petition, attached

---

[2] Because petitioner primarily sets forth the factual background and legal argument of his petition within an attached memorandum of points and authorities, the court will simply cite references to that memorandum as "petition."  Any portion referenced which comes from the petition form portion will be so identified.

[3] A $10,000.00 restitution fine was also imposed, pursuant to Cal. Penal Code § 1204.4 (b).  Id.

1  memorandum, pp. I, 1-30.

2  II.  AEDPA

3         The AEDPA "worked substantial changes to the law of habeas corpus,"

4  establishing more deferential standards of review to be used by a federal habeas court in

5  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

6  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

7         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

8  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

9  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

10  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

11  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

12  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

13  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

14  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

15         "Unreasonable application" of established law, on the other hand, applies to

16  mixed questions of law and fact, that is, the application of law to fact where there are no factually

17  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

18  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

19  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

20  deference is not blindly automatic, "the most important point is that an *unreasonable* application

21  of federal law is different from an incorrect application of law....[A] federal habeas court may not

22  issue the writ simply because that court concludes in its independent judgment that the relevant

23  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

24  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

25  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

26  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

1    authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

2            The state courts need not have cited to federal authority, or even have indicated

3    awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

4    Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

5    contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

6    unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

7    occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

8    established Supreme Court authority reviewed must be a pronouncement on constitutional

9    principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

10   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

11           However, where the state courts have not addressed the constitutional issue in

12   dispute in any reasoned opinion, the federal court will independently review the record in

13   adjudication of that issue.  "Independent review of the record is not de novo review of the

14   constitutional issue, but rather, the only method by which we can determine whether a silent state

15   court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

16   2003).

17   II.  Factual Background

18           Petitioner and his co-defendant, Barbara Carrasco,[4] appealed their convictions,

19   which appeals were consolidated before the Third District Court of Appeal.  Petition, Appendix

20   A.  The unpublished opinion was filed on March 20, 2002.  The factual background as adduced

21   in the opinion is not in dispute, and to the extent there might be any omission or discrepancy in

22   the summary of the facts by either party, the court's independent review confirms the accuracy of

23   \\\\\

24

25           [4] Barbara Carrasco, the co-defendant with whom petitioner was jointly charged, entered a
     guilty plea to second degree murder, on February 9, 2000, the second day of the jury trial.
26   Answer, p. 5, n. 1, citing Clerk's Transcript (CT) 262-263.

the state appellate court's recitation of the facts:[5]

> Larry married Barbara in 1996. They moved into a home in Elk Grove along with Barbara's two daughters, Jessica and Alexia, and Barbara's mother, Margaret R. Alexia's father, Charles C., a person of Asian descent, had two other sons living with a family friend in Pennsylvania.

> Margaret cared for Alexia and Jessica. She fed them, cleaned their clothes, and helped Jessica get ready for school. Jessica attended seventh grade, but five-year-old Alexia did not attend school. Larry and Barbara mostly stayed in their bedroom. Larry and Barbara often spoke of demons. They believed Alexia, Jessica and Margaret were possessed by demons. They also thought people were after them and their house was bugged. Barbara especially spoke of demons, and believed demons lived upstairs in the house's loft.

> Margaret saw both defendants pull the children's hair on different occasions and lock Alexia into a closet. Both defendants occasionally referred to Alexia as an "ugly Chinese bitch" and a "mother fucking bitch." Margaret also saw Barbara hold the flame of a lighter near Alexia's feet.

> Defendants installed a lock on Jessica's bedroom door, and often locked Jessica in her room. They also nailed Jessica's windows shut. While locked in her room, Jessica had no access to a bathroom. Margaret threatened to call the police about this.

> In early 1997, defendants ordered Margaret out of their house. After that point, Jessica stopped attending school regularly and began caring for Alexia, at Barbara's request.

> In June 1997, the family traveled to Pennsylvania to retrieve Barbara's sons. Barbara believed their guardian was a demon. She also believed the boys could help save the world from being taken over by demons and vampires. The family visited with the boys but returned to California without them.

> After their trip, Larry and Barbara decided to make Alexia and Jessica drink bleach "milk shakes" three times a day to rid the girls of demons. The drink was an eight-ounce mixture of ice cream, garlic, and bleach. Jessica refused the first drink, but Larry punched her in the eye and poured the mixture down her throat. Jessica could not keep the drink down and vomited on the floor.

> Defendants forced the girls to drink the bleach mixture three times a day for eight days, a total of 24 drinks. Jessica said the mixture

[5] See also, Petition, pp. 2-5; Answer, pp. 5-10.

tasted "horrible" and made her sick to her stomach.  After the first couple of times, though, she could not feel the effects of the drink.  Jessica drank the mixture because she was afraid Larry "would do something again."  Defendants told the girls they themselves would drink the bleach mixture, but Jessica never saw either of them drink any of it.

Over the next few days, Jessica attempted to assist Alexia into the bathroom to vomit the bleach, but was not always successful.  Jessica estimated she was able to assist her sister in vomiting the bleach at most four times.

After the third or fourth time helping Alexia, defendants locked Jessica into her bedroom so she could not help Alexia vomit the drink.  Defendants thereafter kept Jessica isolated from Alexia.  From her room, Jessica would hear the blender running.  Then she would be brought out of her room to drink the bleach.  Sometimes, Alexia would be brought out at the same time to drink the bleach.

On the eighth day, when Jessica was brought out to drink the bleach, she saw Alexia lying on the floor, with Barbara kneeling beside her.  Alexia appeared pale and unconscious.  Jessica walked into the kitchen, drank the mixture, then walked back into her room.  That was the last time defendants forced Jessica to drink the bleach.

Sometime thereafter, Larry escorted Jessica into the master bedroom.  Looking in the closet, Jessica saw Alexia's body resting on newspapers.  She appeared to be dead.  Barbara, also in the closet, repeatedly told Jessica to say Alexia was in Chicago with her father, Charles C., if anyone asked about Alexia.

With Jessica watching, defendants then dismembered Alexia's body using a saw.  Asked if there was blood everywhere, Jessica replied no.  The dismemberment took approximately two hours.  Defendants placed the body parts inside a garbage bag.  After this, Larry burned the body parts in the home's fireplace, one handful at a time.  The burning lasted approximately one-and-a-half hours.  A neighbor saw black smoke emanating from defendants' chimney that day, and thought it unusual since it was a hot summer's day.

Larry and Barbara placed the ashes in a garbage bag.  Along with Jessica, they drove to the Sacramento River.  Barbara threw the bag of ashes into the river.

Things "calmed down" at home after Alexia's death, and Jessica began attending eighth grade.  When Margaret called and asked about Alexia, Jessica said Alexia was in Chicago with her father.  Barbara was standing there when Jessica said the lie.  Barbara reminded Jessica about the Chicago story every couple of days.

On September 25, 1997, following a complaint by Margaret, sheriff's deputies visited defendants' home.  By this time, Jessica had been ordered to live in a shed in the back yard as "punishment."  Inside the shed were a chaise lounge and a bucket used as a toilet. When asked about Alexia, Jessica lied as instructed by Barbara.

The deputies found no evidence of a young child living at home. They did find a family photo that had cut out of it what would have been the face of a young child.

Barbara forced Jessica to sleep in the shed because she believed Jessica was a demon and was sucking electricity out of the wall sockets.  Barbara also thought Jessica was going to kill the baby Barbara believed she was carrying as a result of an immaculate conception.

On September 30, 1997, while Jessica slept in the shed, Larry entered and, possibly under Barbara's direction, poured bleach over Jessica's entire body, including in her eyes. While doing this, Larry asked in a sarcastic tone, "Do you like this?"

At first, the bleach did not hurt, but later it caused a burning sensation and it was painful for Jessica to walk.  About two hours after pouring the bleach on Jessica, Larry reappeared at the shed and sprayed Jessica off with cold water from a hose.  At morning, Jessica left the shed and went to school without seeing defendants. They were in their bedroom.

As the school day progressed, Jessica's pain increased.  Finally, she told her last-period teacher she could not go home because her parents had poured bleach on her.  The school then contacted the sheriff's department and child protective services.

Deputies searched defendants' house, which smelled of bleach. They also searched the shed, which reeked of urine and bleach. Officers noted new carpeting had been installed in the master bedroom as well as new linoleum in the master closet.

In subsequent police interviews, Jessica freely described the incident in the shed, but continued to lie about Alexia.

In October 1997, a Chicago FBI agent located Alexia's biological father, Charles C., and searched his house.  The agent found no evidence of a child living with him.

Ultimately, Jessica related the details of Alexia's death to her math teacher, her school counselor, and an FBI agent.  After Alexia died, Jessica stated, defendants put Alexia's body in a freezer, and for two days talked about what they were going to do with it. Thereafter, they cut up the body in their closet.

At Larry's trial, Dr. Robert Anthony, a forensic pathologist, testified for the prosecution regarding the effects ingested diluted bleach would have on a person.  Bleach is a corrosive.  It would attack the esophagus and the stomach, causing both to hemorrhage.  Its fumes are chemical irritants.  Upon attacking the lungs, the fumes would cause the lungs to fill with liquid, which in turn could cause heart failure.

Bleach, once in the bloodstream, has also been determined to cause the kidneys, liver and lungs to fail.  Bleach can raise the body's sodium and chloride levels dangerously high, sending the person into a coma.  It also will throw off the blood's acid-base balance, causing the central nervous system to shut down.

Generally, these effects, either individually or in combination with others, could cause death, depending upon the size of the person and the amount of bleach consumed.

On cross-examination, Dr. Anthony opined ice cream in the stomach would not neutralize the bleach any more than the person's gastric lining, which, of course, the bleach destroys.  However, Dr. Anthony was not aware of any studies done to substantiate his opinion.

Petition, Appendix A, 3/20/02, Third District Ct. appellate decision, pp. 2-7.

Petitioner did not testify in his own defense.  His defense consisted of five character witnesses who testified that he had a non-violent character.  Answer, p. 19, citing Reporter's Transcript (RT) 291-292; 294-295; 298; 300; 302-303.

IV.  Argument & Analysis

A. Claim 1-Ineffective assistance of trial counsel for having failed to investigate and provide evidence of the probable effects of drugs on petitioner's mental condition

Petitioner contends that his trial lawyer provided ineffective assistance of counsel because, despite his counsel's awareness of the evidence in evaluations/reports of his psychological condition, his trial attorney failed to have petitioner's blood tested or subject him to any other "conventional drug testing"; did not obtain petitioner's medical records to determine "the prescribed medications he was ingesting"; did not investigate whether petitioner was involuntarily subjected to any drugs or whether he was "unknowingly subjected to a larger quantity of drugs he was taking voluntary [sic]";  failed to consult experts "to obtain scientific

1  data as to the chemical make-up of each individual substance/drug petitioner was ingesting"; and

2  did not "consult an expert to determine whether the drugs ingested by petitioner, either as to their

3  nature, quantity, or cumulative effect, might have resulted in a diminished capacity to commit the

4  criminal acts leading up to, and including, the death of the victim, and those thereafter charged,"

5  Petition, pp. 8-9.

6          *Legal Standard*

7          The test for demonstrating ineffective assistance of counsel is set forth in

8  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show

9  that, considering all the circumstances, counsel's performance fell below an objective standard of

10 reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must

11 identify the acts or omissions that are alleged not to have been the result of reasonable

12 professional judgment. Id. at 690, 104 S. Ct. at 2066. The federal court must then determine

13 whether in light of all the circumstances, the identified acts or omissions were outside the wide

14 range of professional competent assistance. Id., 104 S. Ct. at 2066. "We strongly presume that

15 counsel's conduct was within the wide range of reasonable assistance, and that he exercised

16 acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d

17 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

18         Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at

19 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for

20 counsel's unprofessional errors, the result of the proceeding would have been different." Id. at

21 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine

22 confidence in the outcome." Id., 104 S. Ct. at 2068.

23         In extraordinary cases, ineffective assistance of counsel claims are evaluated

24 based on a fundamental fairness standard. Williams v. Taylor , 529 U.S.362, 391-93, 120 S. Ct.

25 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

26 \\\\\

1      The Supreme Court has emphasized the importance of giving deference

2  to trial counsel's decisions, especially in the AEDPA context:

3          In Strickland we said that "[j]udicial scrutiny of a counsel's
           performance must be highly deferential" and that "every effort
4          [must] be made to eliminate the distorting effects of hindsight, to
           reconstruct the circumstances of counsel's challenged conduct, and
5          to evaluate the conduct from counsel's perspective at the time."
           466 U.S., at 689, 104 S. Ct. 2052.  Thus, even when a court is
6          presented with an ineffective-assistance claim not subject to
           § 2254(d)(1) deference, a [petitioner] must overcome the
7          presumption that, under the circumstances, the challenged action
           'might be considered sound trial strategy.'  Ibid. (quoting Michel v.
8          Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L.Ed. 83 (1955)).

9          For [petitioner] to succeed, however, he must do more than show
           that he would have satisfied Strickland's test if his claim were
10         being analyzed in the first instance, because under § 2254(d)(1), it
           is not enough to convince a federal habeas court that, in its
11         independent judgment, the state-court decision applied Strickland
           incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he
12         must show that the [ ]Court of Appeals applied Strickland to the
           facts of his case in an objectively unreasonable manner.

13

14  Bell v. Cone, 122 S. Ct. 1843, 1852 (2002).

15      Petitioner claims that his trial counsel had overwhelming evidence concerning

16  petitioner's "intake of mind altering substances," including:

17         1.  Petitioner was exposed to alcohol abuse, specifically his father's
           alcoholism (Ex. B, p.2);
18
           2.  Petitioner has/had a personality style that puts him at risk for
19         addiction (Ex. B, p.3);

20         3.  Petitioner has a continuous history, predating 1986, of serious
           depression, which was predominant at the time of the offenses (Ex.
21         B, p. 3);

22         4.  Petitioner had procured two driving while intoxicated offenses,
           the lat[t]er of which, resulted in petitioner being ordered to out-
23         patient treatment for alcoholism (Ex. D, p. 2);

24         5.  Petitioner was on legally prescribed drugs due to physical
           conditions he sustained in 1996, including Darvon, Darveset [sic],
25         Valium, and muscle-relaxers (Ex. B, pp. 3-4; Ex. D, pp. 2-3);

26  \\\\\

6.  Petitioner was drinking a case of beer a day along with 1.75 liters of hard liquor at the time of the offenses (Ex. C, p. 2);

7.  Petitioner was using an increasingly [sic] amount of methamphetamine at the time of the offenses (Ex. B, pp. 3-4; Ex. D, pp. 1-2); and

8.  Three persons were of the opinion that the petitioner was being druged [sic] (Ex. E).

Petition, pp. 7-8.

The exhibits on which petitioner primarily relies in support of this ground, Exhibits B and D, are copies of reports that, inter alia, assess petitioner's psychological condition.[6]  Exhibit B is a report in the form of a letter, dated August 14, 1998, addressed to petitioner's trial counsel, John Paul Lippsmeyer, from Paul G. Mattiuzzi, Ph.D.  In the letter, Paul Mattiuzzi states that he has conducted a clinical examination of petitioner at counsel Lippsmeyer's request.  Petition, Ex. B, p. 1.  Petitioner concedes that defense counsel did obtain Dr. Mattiuzzi's professional services, asserting that this was for the purpose of assessing petitioner's mental and emotional functionality with regard to preparing his defense.  Id., at 9.  In addition, he grants that the trial court had both Dr. Edwards and Dr. Miller evaluate his mental competency to stand trial.  Id.  However, petitioner contends that whether "he was competent to stand trial did not foreclose a defense of diminished capacity to the specific intent offenses."  Id.,

Petitioner asserts that Dr. Mattiuzzi's examination did not entail drug testing or information about the prescribed drugs he was using at the time of the offenses; was performed before petitioner was charged with Alexia's murder; applied only to offenses related to Jessica; and stated that as to Alexia, "it is not clear that [petitioner] was able to accurately assess the

\\\\\

\\\\\

\\\\\

---

[6] Although the exhibits attached to the petition are unauthenticated, they are identical to (duplicates of) the reports by Dr. Miller and Dr. Edwards which are included in the Clerk's Transcript, Vol. I, pp. 1-9.  As to the letter from Dr. Mattiuzzi to petitioner's trial counsel, respondent does not challenge its authenticity.

meaning or implications of this behavior." Id., quoting Ex. B, p. 4.[7]

Petitioner's first problem in arguing that his alleged addictions should have been advanced to support an argument of diminished capacity, is that the doctrine had long been abolished in California at the time petitioner committed his crimes. People v. Saille, 54 Cal. 3d 1103, 1109-1112, 2 Cal. Rptr. 2d 364, 367-369 (1991). Thus, petitioner's intoxication argument falls immediately.

Assuming for the moment that petitioner is asserting that he actually did not form the intent required for murder, at all relevant times, because of voluntary intoxication, the record utterly refutes such an assertion.

Overindulgence in illegal drugs or alcohol does not *per se* warrant the giving of an intoxication instruction. One must present evidence that he is legally unconscious. Under California law when a person renders himself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his negligence and is treated as involuntary manslaughter. People v. Ochoa, 19 Cal. 4th at p. 423, 79 Cal. Rptr. 2d 408. Unconsciousness for this purpose need not mean that the actor lies still and unresponsive. Id. at 423-424, 79 Cal. Rptr. 2d 408. Instead, a person is deemed "unconscious" if he committed the act without being conscious thereof. Id. See also CALJIC 8.47 "If you find that a defendant, *while unconscious as a result of voluntary intoxication*...When a person voluntarily induces his own intoxication *to the point of unconsciousness*..." (emphasis added). Although unconsciousness does not require the incapacity to move or act, the given definition is somewhat of a tautology; however, other

_____

[7] The full paragraph containing statement is as follows: "He said it was on June 18th, 1997 that Alexia died. He said that on the day before, Barbara and Jessica were giving her an enema with some type of concoction. Barbara was apparently in the habit of forcing the formula into the children's [] ears and noses. He said that he knew at the time that this behavior was bizarre, but it is not clear that he was able to accurately assess the meaning or implications of his behavior. By his report, he had told Barbara around the time of Alexia's death that if it was really true that they were possessed, perhaps they should get some professional help, rather than trying to solve the problem on their own. When Alexia died, he noted that there were burn marks on her body. At that time, he says he told Barbara that 'she had really fucked up.' He wanted to call the police, but Barbara insisted otherwise." Ex. B. P. 4.

cases and authority define the level of lack of consciousness – and the level is very difficult to reach.  One court has held that the level is that of an automaton.  People v. Webber, 228 Cal. App. 3d 1146, 1163, 279 Cal. Rptr. 437 (1991).[8]  In other cases, courts found insufficient evidence to support a sua sponte intoxication jury instruction when (1) the defendant had drunk some beer and whiskey and was "'pretty well plastered'" People v. Spencer , 60 Cal. 2d 64, 88, 31 Cal. Rptr. 782 (1963); (2) the defendant had been drinking for several hours, but was "only woozy and not completely 'blacked out'" People v. Simpson  192 Cal. App. 3d 1360, 1370, 237 Cal. Rptr. 910) (1987); (3) the defendant had been drinking before the crime; he appeared to be "'a little high'" at the time of the crime, and he testified he was "'pretty drunk,'" (People v. Cram (1970) 12 Cal. App. 3d 37, 42, 90 Cal. Rptr. 393 (1970)); and (4) the defendant had drunk a dozen beers and some wine and thought he was drunk, but knew what he was doing, People v. Gonzales (1970) 4 Cal. App. 3d 593, 607, 84 Cal. Rptr. 863 (1970).

Thus, in California, a defendant may not argue that he lacked the capacity to commit a crime because of intoxication, but is permitted to argue that he *actually* lacked the specific intent required on account of voluntary intoxication.  (People v. Williams, 16 Cal. 4th 635, 677, 66 Cal. Rptr. 2d 573 (1997)).  In order to be intoxicated to the point where one actually lacks the required intent, one must be acting as if an automaton.

Petitioner points to nothing in the record (a) showing that he was severely intoxicated at the time he administered the bleach cocktail, and (2) that he had become legally unconscious as a result of intoxications at the time of his bleach administrations.  Simply being intoxicated on occasion says nothing about the intent involved during his continuous criminal activities.  To simply pose the scenario of "omni-present intoxication to the point of legal unconsciousness," demonstrates its absurdity on the given facts of this case.  For example, a

---

[8]  "Automaton" is defined in this context as "a person or animal acting in an automatic or mechanical way."  *Webster's New World Dictionary*, Third College Edition at 93.  "Automatic" in its pertinent meaning is defined: "done without conscious thought or volition, as if mechanically, or from force of habit."  Id.

person who decides to separate his victims so that they cannot aid one another is not legally

unconscious.  A person who tells his victims that he will ingest the poison drink, but consciously

does not, is not legally unconscious.  A person who relates that he had a purpose for

administering the horrible potion, however perverted, and that he deliberately acted on that

purpose, is not legally unconscious.  A person who gives his daughter a bleach bath and then asks

whether she "likes that" is not legally unconscious.  Finally, a person who has tortured and killed

his toddler daughter, and then hides the body parts is acting with a conscious fear of getting

caught and punished for what he has done.

Moreover, the medical investigations which were done in other areas,

incompetence and insanity, refutes petitioner's allegations herein (again assuming a voluntary

intoxication defense as opposed to diminished  capacity).

The Mattiuzzi letter sets forth petitioner's background and emotional and mental

state in extensive detail, as well as petitioner's version of the circumstances of the crimes for

which he was then charged and what led to those events.  In a portion of the letter-report, entitled

"Discussion:" Dr. Mattiuzzi makes the following analysis/assessment based on his interview and

mental status examination of petitioner:

> As indicated above, Mr. Carrasco is not currently psychotic or out
> of touch with reality.  Although he remains seriously depressed, the
> nature of his condition does not appear to be that of a major mood
> disorder.  His depression is the result of characterological
> emotional inadequacies, along with a series of traumatizing life
> experiences.  The feelings of persecution he continues to
> experience are not based on delusion and are not the result of an
> essential paranoid process.  In sum, it cannot be said that he is
> currently suffering from a mental disease, disorder or defect.  Aside
> from the diagnosis of any relevant Axis II personality disorder, his
> condition would be described as Dysthymia, rather than a Major
> Depression.

Id., at 6.

Dr. Mattiuzzi then expresses his professional opinion that petitioner "is

competent, and that there is no reason for you to express a doubt.  There is no reason to believe

1    that he cannot enjoy due process and effective representation because of a mental disorder." Id.

2    The report continues:

> With respect to the question of whether his mental status at the
> time of the offense was diminished in such a way that he did not in
> fact form the intent to commit the crimes charged, my opinion is
> that these data are not helpful to the defense.  The allegation is that
> he tortured the victim.  It is my opinion that he was depressed and
> disorganized at that time, but it is quite clear that he was also angry
> and resentful.  Even if we believe that he was acting on the basis of
> a delusional belief that the victim was possessed by demons and
> required some form of purging, it remains apparent that his
> motivational state included anger and hostility, both in general and
> specifically directed towards the victim.  Whether it was just one
> element in his motivational and intentional state, or whether it was
> the primary motivation determinant, his behavior involved
> animosity towards the victim.  For this reason, it cannot be said
> that he lacked any intent to harm the victim.  It cannot be said that
> he did not form the intent to hurt her, or at least to express his
> anger or his anger towards her through his behavior.  In other
> words, the data I have obtained do not support a "diminished
> actuality" theory.  Perhaps he did not truly intend to harm her, and
> perhaps he did not truly intend to torture her, but the evidence
> regarding his mental state does not prove otherwise.  This question
> remains to be resolved on the basis of a factual determination
> regarding the quality and characteristics of his actual behavior.  As
> indicated above, his statement is that he did not engage in
> behaviors consistent with an allegation of torture and he did not
> have such an intent.  The psychological data do not show either
> that he did not or that he could not have actually done so.

Id.

> In the next portion of his report, addressing the question whether petitioner could
>
> have been insane at the time of the incidents at issue, Dr. Mattiuzzi's report continues:

> A similar analysis applies to the question of whether or not he may
> have been insane.  On this point, we have his statement that he
> acted on the basis of a belief that he was simply seeking to exorcise
> demons.  But we also have his statement that he threw the bleach
> on her because he was mad at her.  The first statement suggests that
> he did not know that what he was doing was wrong.  However,
> there are not sufficient data to conclude that he actually lacked the
> capacity to know that it was wrong.  As indicated, he said that he
> was not really sure that the demon possession story was really true.
> The fact that there was a doubt in his mind implies that he retained
> some capacity to test the question and to assess the reality of his
> perceptions.  It suggests that he was not entirely divorced from the
> reality of the situation.  The standard for insanity requires a loss of
> ability to judge the wrongfulness of one's actions.  If he was able to

raise the question in his own mind, he must have had some ability to arrive at the correct determination.  And, if we accept his latter statement, the possibility that he suffered a legally relevant capacity loss is completely eliminated.  His second statement implies that he threw the bleach on the victim simply because he was angry at her, not because of a delusional misunderstanding of the situation.

Id., at pp. 6-7.

Dr. Mattiuzzi concludes that petitioner fails to provide sufficient data to support his (Mattiuzzi) giving an opinion that petitioner was insane, noting that the burden of proof for insanity rests upon the defendant.  The report concludes:

And going beyond just an interpretation of his statements, we must also consider what he describes as his mental state at the time.  It [sic] of significance to the sanity question that he reports suffering a severe depressive episode after the death of Alexia, which then resolved sufficient for him to assist in the disposal of her body.  The whole point of the depressive episode was that he knew what Barbara was doing with her children was crazy, bizarre and wrong.  There is no connection in his story that would allow us to assume that he later became more delusionally disturbed himself.  There is no link in his story suggesting that after the death of Alexia, that he somehow overcame his intensely accurate perception of reality (the perception that generated the depression) and fell into a state of delusional psychosis that rendered him either incapable of knowing the nature and quality of his acts, or incapable of knowing that they were wrong.

And with respect to just the basic clinical and diagnostic history, it does not make sense to argue that he suffered a legally relevant capacity loss of magnitude sufficient to serve as the basis of an insanity plea.  Instead, what we see is emotionally and adaptively inadequate individual, who was beaten down even more by a series of unfavorable and traumatic life events, who essentially gave up and gave in to a disturbed and controlling malefactor, and who was complicitous to some degree because of his passivity, and who probably lashed out at the victim in anger.

I hope the above is helpful in your efforts on his behalf.  If I can provide further comment, please let me know.  For now, I would like to note also that it is my opinion that there are no additional avenues of psychological examination or investigation that would be necessary for you to pursue in order to provide him with effective representation.

Id., at 7.

16

1        Exhibit D is a letter, dated March 9, 1999, entitled "Psychological Consultation

2   Report," directed to Judge Cheryl C. Meegan of the Sacramento County Superior Court, from a

3   court-appointed clinical psychologist, Jeffrey Miller, Ph.D.  See also, Clerk's Transcript (CT),

4   Vol. I, pp. 1-6.  The letter/report indicates that Dr. Miller was appointed by the court to conduct a

5   psychological evaluation of petitioner, pursuant to Cal. Penal Code § 1367, to determine whether

6   he was mentally incompetent to stand trial at that time.* Ex. D, pp. 1-6.

7        Following a "structured interview," this psychologist concluded in his detailed

8   report that petitioner, although depressed, was competent to stand trial:

> Mr. Carrasco is a 50-year-old man who is currently charged with
> multiple felony counts in connection with the alleged physical
> abuse of his step-daughter.  The results of the current evaluation
> indicate that he has an adequate basic knowledge and
> understanding of the criminal proceedings and he is capable of
> assisting his attorney in the conduct of a defense in a rational
> manner.  However, he is also depressed and has a general sense of
> resignation as well as a pessimistic attitude towards the likely
> outcome of his case.
>
> Mr. Carrasco believes that the evidence against him is
> overwhelming and he is "tired" of having to defend himself against
> the "system."  While this is likely to make it difficult for his
> attorney to provide him with an optimal defense, his lack of
> motivation to help himself does not rise to the level that it would
> make him incompetent to stand trial.  He is able to offer a
> reasonable defense strategy and is likely to cooperate with his
> attorney, even though he believes any defense on his part is likely
> to be futile.  He is depressed in response to his legal predicament
> and wants the trial process to be over with as soon as possible so
> that he can begin serving his sentence.  This appears to be a
> rational decision on his part, and is not the result of a mental
> disorder or mental disability which would require treatment.

21  Id., at 5-6.

22        Both reports contain references to petitioner's own recounting of his history of

23  alcohol abuse.  Petitioner informed Dr. Mattiuzzi that his father was an alcoholic, and the doctor

24  found it of interest that despite petitioner's "personality style," putting him at risk for addiction,

25  petitioner evidently did not become addicted to heroin while serving in Viet Nam. Ex. B, pp. 2-

26  3.  Following a back injury in 1996 from an assault which petitioner stated occurred while he

was a bus driver and which evidently disabled him, petitioner lost his job, became destitute and "severely depressed and began using alcohol heavily between 1996 and day of his arrest in September of 1997. He states that he had used marijuana and occasionally methamphetamines, but primarily was alcohol dependent." Ex. D, Dr. Miller's report, p. 2. Petitioner had had two driving under the influence (DUI) arrests. Id. Dr. Mattiuzzi also notes that petitioner informed him of methamphetamine use following his injury to cope with his pain and depression, although his inclination was to self-medicate with alcohol. Ex. B, p. 3. Dr. Miller references petitioner's taking Valium and muscle relaxants. Ex. D, pp. 2-3.

In Dr. Miller's report, it was stated that petitioner "was unable to provide an account of the events which preceded his arrest...."

> He indicated at that time he was under the influence of a substantial amount of alcohol and Valium and, for this reason, does not have any recollection of his involvement in the alleged offense or any of the events preceding his arrest.

Id., at 3. Dr. Miller refers to petitioner's "claimed amnesia" about events preceding his arrest. Ex. D, p. 5.

Exhibit C (see also, CT, Vol. I, pp. 7-9), is a copy of a letter to Judge Meegan from Daniel Edwards, Ph.D, MPH, ABPP, dated March 4, 1999, which recounts his "structured interview" and testing of petitioner, along with a "lengthy phone conversation" with petitioner's trial counsel, who recounted that petitioner was having problems with depression and difficulty cooperating with counsel "in the conduct of a rational defense." Ex. C, p. 1; Dr. Edwards indicated a normal level score on the Mini Mental State Exam by petitioner. Id., p. 2. Petitioner reported memory problems he attributed to drinking, stating that he had been "drinking a case of beer a day along with 1.75 liters of hard liquor...." Id. Dr. Edwards believed that other tests administered indicated that petitioner was malingering. Id. Dr. Edwards opined that petitioner met "the legal criteria for competence to stand trial." Id., p. 3. Petitioner's Exhibit E is a copy of a one-page list of what appears to be potential witnesses for petitioner, primarily family

1    members, and a few co-workers.  Ex. E.  Anticipated testimony by two or three potential family

2    member witnesses appears to be that Barbara [Carrasco] was drugging/controlling petitioner.  Id.

3              In Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998), the Ninth Circuit found that

4    petitioner had received ineffective assistance of counsel when, despite clear evidence available to

5    counsel at the time of trial regarding his client's extensive history of mental problems and

6    counsel's actual awareness of the client's having psychiatric problems, counsel failed to conduct

7    any investigation "to ascertain the extent or possible ramifications of his client's psychiatric

8    impairment," depriving petitioner of a potentially meritorious defense.  146 F.3d at 756.  The

9    appellate court found that had a mental illness defense been presented, there was a "reasonable

10   probability that ...the jury would not have found the existence of malice" to support a second-

11   degree murder conviction under California law.  Id., at 757.  However, the facts of that case are

12   distinguishable from those of the instant case because counsel in this matter did indeed

13   concededly seek expert opinion as to petitioner's mental state.

14             While trial counsel has a duty to investigate the mental state of a defendant "if

15   there is evidence to suggest that the defendant is impaired," Douglas v. Woodford, 316 F.3d

16   1079, 1085 (9th Cir. 2003), petitioner's contention that his trial counsel was ineffective for not

17   investigating mental state defenses herein "is a far fetch."  Busch v. Woodford, __F.3d __ , 2007

18   WL 2429363, *4 (9th Cir. Aug. 29, 2007).  As in Busch, the psychiatric evaluations herein did not

19   suggest that petitioner was impaired.

20             The two pre-trial psychiatric evaluations of Busch by Drs. Drury
             and Rossoff not only determined that he was competent to stand
21             trial, but also concluded that the petitioner did not suffer from
             mental disorders.  Busch points to the psychiatric evaluation of Dr.
22             Drury, who examined Busch prior to trial. (Petitioner's ER at 1-6.)
             That evaluation describes Busch's prior medical history, including
23             his suicidal thoughts as a young teenager, his abuse of
             methamphetamines and prescription drugs for several years before
24             the crime and head injuries Busch suffered in an auto accident in
             early 1996 and a motorcycle accident in December 1996. ( Id. at 4.)
25             After considering this and the other information contained in his
             evaluation, Dr. Drury concluded that "[b]ased upon personal
26             information, it is my opinion that he is essentially free of major

19

signs of mental disorder, mental diseases or psychiatric disease."
( Id. at 6.)  In addition, Dr. Thomson-the expert psychiatrist who
testified at the evidentiary hearing on Busch's state court habeas
petition-agreed that he had no doubt that Busch was competent to
stand trial.  (Respondent's ER at 141.)  Although Dr. Thomson
testified that Busch experienced some symptoms of "classical drug
induced paranoia" as a result of his prior substance abuse ( id. at
73) and that he thought Busch may have suffered from some form
of organic brain injury due to his prior head injuries ( id. at 135-38,
144-45), he testified that Busch did not possess any "major" or
"full blown" mental illness or mental disorder ( id. at 74-75, 89).

The petitioner draws a distinction between competency evaluations
and investigating mental defenses, arguing that a psychiatric
evaluation that concludes that an individual is competent to stand
trial is not the same as investigating mental defenses.  Although
this might be true, the duty to investigate mental defenses is only
triggered "if there is evidence to suggest the defendant is
impaired."  Douglas, 316 F.3d at 1085.  The defendant fails to
point to any credible evidence of mental incapacity which would
have triggered a duty on the part of his counsel to investigate for
possible defenses.

Id., at * 4-5.

Petitioner asks for an evidentiary hearing on this claim, contending that he sought

and was denied such a hearing in state court.  Petition, p. 11.  An evidentiary hearing would be

warranted only if petitioner had alleged facts which, if proven, would establish both prongs of the

Strickland test, both deficient performance and prejudice.  Gonzalez v. Pliler, 341 F.3d 897, 903

(9th Cir. 2003) (even where constitutional error is found, petitioner must show actual prejudice).

In this case, petitioner has not even made a showing of deficient performance/constitutional

error.  "To obtain an evidentiary hearing on an ineffective assistance of counsel claim, a habeas

petitioner must establish that (1) his allegations, if proven, would constitute a colorable claim,

thereby entitling him to relief and (2) the state court trier of fact has not, after a full and fair

hearing, reliably found the relevant facts."  Correll v Stewart, 137 F.3d 1404, 1413 (9th Cir.

1998).  Nevertheless, the court does not have to hold an evidentiary hearing when the record

clearly refutes the collateral factual allegations raised by petitioner.  Schiro v. Landrigan,

__U.S.__, 127 S. Ct. 1933, 1940 (2007); similarly, palpably incredible or patently frivolous

claims need not garner an evidentiary hearing just because the petition "says so." United States v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003).

Given the fact that petitioner has not demonstrated that counsel was unreasonable for not attempting what appears to be an absurd defense of "voluntary intoxication at all times," petitioner has not met the first prong of ineffective assistance of counsel.

This ineffective assistance of counsel claim should be denied.

B. Claims 2 -Insufficient evidence that petitioner acted in conscious disregard of Alexia's life to support second degree murder conviction

Petitioner argues that there was insufficient evidence to support his conviction for second degree implied malice murder of Alexia, citing Cal. Penal Code § 188.[9] Petition, p. 14.

*Legal Standard*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas. Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could have reached the same conclusion that these jurors

---

[9] "**§ 188. Malice, express malice, and implied malice defined**
Such malice may be express or implied. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

1   reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

2          If the trier of fact could draw conflicting inferences from the evidence, the court in

3   its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

4   469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

5   at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

6   trier of fact could have found the conviction scenario beyond a reasonable doubt.

7              In reviewing the sufficiency of the evidence supporting a
               conviction, we search the record to determine "whether a
8              reasonable jury, after viewing the evidence in the light most
               favorable to the government, could have found the defendants
9              guilty beyond a reasonable doubt of each essential element of the
               crime charged."  United States v. Douglass, 780 F.2d 1472, 1476
10             (9th Cir.1986).  *The relevant inquiry is not whether the evidence
               excludes every hypothesis except guilt, but whether the jury could
11             reasonably arrive at its verdict.*  United States v. Fleishman, 684
               F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct.
12             464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d
               1337, 1343 (9th Cir.1981), overruled on other grounds, United
13             States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

14   United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

15          Superimposed on these already stringent insufficiency standards is the AEDPA

16   requirement that even if a federal court were to initially find on its own that no reasonable jury

17   should have arrived at its conclusion, the federal court must also determine that the state

18   appellate court not have affirmed the verdict under the Jackson standard in the absence of an

19   unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

20              *Discussion*

21          Conceding that there was testimony that Alexia and Jessica vomited at certain

22   times after drinking the bleach mixture, petitioner contends that no testimony was presented that

23   petitioner was making his step-children drink the bleach in conscious disregard of their lives.  Id.,

24   at 15, citing RT 87, 91.  He does not argue that he did not compel the children to drink the toxic

25   bleach concoction but rather that he was doing so for the purpose of ridding them of demons;

26   thus, he contends that his intent was to help rather than hurt them; further, the only signs of ill

effects were the girls' vomiting, which he maintains subsided after the first bleach-drinking episodes; and finally, upon petitioner's realization that the bleach could cause death, he immediately ceased compelling Jessica, the surviving child, to drink bleach.  Id., citing Jessica's testimony at RT 90-92, 95, 102.   Petitioner contends that the state appellate court opinion that it is "common knowledge" that ingesting bleach could be fatal overlooked the "undisputed facts" and that such common knowledge should not be imputed to him to indicate that petitioner was subjectively aware of the risk to the girls, when no expert testimony opined that this awareness was common knowledge or that petitioner knew of the risk.  Id.  He avers that expert testimony presented by Dr. Angela Rosas, who offered the opinion that drinking pure bleach could be fatal, also conceded that dilution could reduce the toxic effects.  Id., at 15-16, citing RT 284-85, 288.

He states that the other expert witness who testified only said that drinking bleach causes hemorrhaging and death by affecting internal organs.  Id., at 16.

In rejecting this claim, the state appellate court reasoned as follows:

> Defendant first argues the prosecution submitted insufficient evidence to prove implied malice second-degree murder. We disagree.

> Our role in reviewing the sufficiency of the evidence in a criminal case is a limited one. We examine the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Substantial evidence is evidence which is reasonable, credible, and of solid value. Although mere speculation cannot support a conviction, the trier of fact is entitled to draw reasonable inferences from the evidence and we will presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.

> The standard of review remains the same in a case based upon circumstantial evidence. We must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. We must decide whether the circumstances reasonably justify the jury's findings, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.

> Second degree murder is the unlawful killing of a human being

23

with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder. Generally, the intent to unlawfully kill constitutes malice. Express malice murder requires an intent to kill. Implied malice murder requires an intent to do some act, the natural consequences of which are dangerous to human life. When the killing is the direct result of such an act, the requisite mental state for murder-malice aforethought-is implied. In such circumstances, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." ( People v. Bohana (2000) 84 Cal.App.4th 360, 367-368, 100 Cal.Rptr.2d 845, citations and quotation marks omitted.)

Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) " '[I]mplied malice has both a physical and a mental component, the physical component being the performance of " 'an act, the natural consequences of which are dangerous to life,' " and the mental component being the requirement that the defendant " 'knows that his conduct endangers the life of another and ... acts with a conscious disregard for life.' " ' '[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard.' [¶] 'Implied malice, like all other elements of a crime, may be proven by circumstantial evidence.' 'The very nature of implied malice ... invites consideration of the circumstances preceding the fatal act.' " ( People v. James (1998) 62 Cal.App.4th 244, 277-278, citations omitted, italics in original.) Defendant claims the evidence does not demonstrate he subjectively understood forcing Alexia to drink bleach would endanger her life. He had her drink the bleach to rid her of demons; in other words, to help her, not hurt her. He saw no signs of illness in either girl except when Alexia vomited the mixture the first time. There was no evidence he saw Jessica help Alexia vomit on three or four occasions, and no expert testimony regarding what he would have seen by giving the girls the laced milkshakes. Moreover, he stopped forcing Jessica to drink the bleach once he saw it killed Alexia.

However, it is a matter of common knowledge that the ingestion of significant amounts of a chemical like bleach can kill a person. The fact defendant forced the girls to drink it, but would not drink it himself, illustrates his understanding of the danger to life posed by ingesting bleach. Although he mixed the bleach with ice cream to dilute it, he continued making the girls drink it even after he knew it made them vomit. He and Barbara even locked Jessica in her room so she could not interfere with Alexia drinking the mixture and help her vomit it. These facts constitute substantial, circumstantial evidence defendant knew that repeatedly making Alexia drink the bleach was dangerous to her life.

24

> Defendant argues he did not act in conscious disregard of Alexia's life because he actually was trying to save her life by ridding her of demons. His belief in saving Alexia from demons, however, did not negate his understanding of the risk of death he brought upon Alexia. Even if he believed the outcome eventually would be good mentally, he still understood the risk of physical harm entailed in obtaining that outcome was high.
>
> Substantial evidence supports the jury's conclusion defendant harbored implied malice sufficient to be convicted of second-degree murder.

Petition, Appendix A, State Appellate Opinion, pp. 9-12.[10]

On direct appeal, the California Court of Appeal was the last state court to issue a reasoned decision addressing petitioner's sufficiency of evidence claims. Respondent's lodged document 3 (Exh. A - appellate opinion)[11] and petition (Appendix B-1, summary denial of petition for review by California Supreme Court). Accordingly, the court considers whether the denial of these claims by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

This court's independent review of the record, including those portions of the record cited by petitioner in support of this claim, confirm the findings of the Court of Appeal. In addition, the undersigned emphasizes:

(Jessica's testimony):

> 1.   She indicated that the bleach concoction had been mixed with garlic and ice cream. RT 86-87. [petitioner's attempt to disguise the bleach indicated that petitioner knew that bleach by itself, or in a minimally diluted form, was toxic]
>
> 2.   Although petitioner at one time had told Jessica that he and his wife would drink the concoction, neither ever did. RT 88-89. [indicating that both knew full well the deleterious effects of the bleach mixed drink]

---

[10] Respondent's lodged document has pages 11-12 missing from the appellate court opinion.

[11] The state court appellate opinion is also attached as Appendix A to the petition.

3.  After petitioner threw bleach on Jessica, he would later hose her
off and her surroundings, RT 108-111 [indicating both that
petitioner knew of the dangerous, caustic propensities of bleach
and ultimately needed to neutralize it to the best of his ability, and
consciousness of guilt, i.e., that simply leaving the bleach in
Jessica's surroundings might not be a good idea.]

While the above are not the only inferences which could be possibly drawn from this testimony,

they are reasonable inferences which the jury was entitled to draw.  Such inferences surely

support the fact that petitioner was acting with knowledge of the dangerous-to-life propensities of

the bleach.

Moreover, it was obvious from the testimony as a whole that petitioner desired to

use a chemical that was likely to be dangerous to human life; i.e., he did not pick diet coke to

accomplish his aims, but rather used a chemical that is not served anywhere, in anyplace, or at

any time as a dietary, primary ingredient.  As a prosecution expert testified: "the material comes

with warning labels on it – it is a well known irritant."  RT vol. 2 pp.313-314.   This conscious

choice of "exorcist materials" again clearly indicates petitioner's knowledge of the serious harm

causing qualities of the bleach.

Petitioner references certain testimony of Dr. Angela Rosas, UC Davis Medical

Center pediatrician and Associate Director of the UC Davis Child Abuse Program and Medical

Director of the clinical facility.  RT, vol. 1, pp.  278-280.  Petitioner specifically references the

trial record of Dr. Rosas direct testimony at pages 284-285 and 288 of the reporter's transcript, as

support for his claim of insufficient evidence having been presented to support the second degree

murder conviction.

Q.  Okay. Now I want to change your focus somewhat and talk about the
ingestion of bleach, that is, drinking the bleach.
First of all, would drinking the bleach be potentially harmful to the human
body?
A.  Yes.
Q.  Why?
A.  Several reasons.  It could cause problems.  The greatest one is
irritant.  Just as it is an irritant of the skin, it is an irritant to the
lining of the esophagus or the tube where you swallow food down

to.
     Alkalis in general can cause a burn through the esophagus.
Especially it pokes a hole through the esophagus and then cause the
contents of the esophagus to spew out into the rest of the body
cavity and cause an infection and irritation within the body cavity.
That would be a life threatening situation.
     The few other things from swallowing it, if you happen to
inhale it as it's going down the throat, you can also develop this
lung disease or irritation of the lungs called pneumonitis.
     Potentially if you swallow a large enough volume of it, you
might even have acid base problems within your body that the Ph
or acid metabolism in the body would change in a way that cells no
longer function.
Q.  Now, you said you could possibly inhale it as you are drinking
it meaning some of it gets into your lungs?
A.  Yes.
Q.  And the lung disease you talked about, is that a disease if left
untreated could be potentially fatal?
A.  Yes.
Q.  Assuming there was no lung disease but there was continued
drinking of bleach over a period of a week, eight days, what is it or
could this be fatal to - - I'm talking about a five year old child in
this case?
A.  Yes.  It could be fatal.
Q.  What would it be with the repeated drinking of bleach that
would be fatal to a five year old child?
A.  I would have to say all the three things I described.  It could be
that the high volume of it could cause an acid base problem with
the body.  Every time she would take a sip or swallow of it, she
would be put at risk for aspirating or inhaling some of it into the
lungs, and a higher volume of it may also put her at greater risk for
irritation in the esophagus, and eventually having a hole actually
burn through her esophagus.

.......................................................................................................

RT, vol. 1, pp. 284-286.

     Under cross-examination, the following testimony was elicited from Dr. Rosas

regarding the potentially toxic effects of bleach ingested by a thirteen-year-old in the form of a

mixture, including ice cream, and possibly garlic and spices.  RT, vol. 1, p. 288.

A.  Full strength bleach would inevitably cause some injury to the
body if taken in high quantity and repeated doses.  If the bleach is
diluted down, the toxic effects would be less.  So there are
questions regarding what the toxic [sic] would be.  It would have to
be diluted down quite a bit.

27

1    Q.  I am saying - - well, you get this medical history from a person.
I ingested bleach mixed with ice cream.  It tasted yucky.  In fact, it
2    tasted chalky, and I am a little person.  So I can't really describe it
a whole lot better than this to you.  I don't have any sensations.  I
3    don't have any upset stomach.  Although one time I took it, I threw
it up, but I smell the bleach.
4         What can you tell from that history?
A.  You really wouldn't be able to tell much about body injury just
5    by getting a history, but it would be worrisome.  You would want
to do the further evaluations.
6    Q.  You couldn't tell anything from that history and that evidence
alone - - you as a medical doctor  - - that evidence as to what
7    quantity bleach was there and in what concentration, right?
A.  If no one is giving me the information about this exact quantity
8    of the volume of the toxic substance, I wouldn't be able to know,
that's true.
9    Q.  Yeah.  So in terms of everything you have said in regard to
hurting the esophagus and burning a hole in it, doing something to
10   your stomach, causing pneumonitis, et cetera, et cetera, you are
talking about undiluted bleach out of a Clorox bottle, right?
11   A.  Yes.
Q.  So you are not talking about ice cream?
12   A.  No.  I would not be talking about ice cream mixed in with it.

13   ...........................................................................................

14

15   RT, vol. 1, pp. 288-289.

16        The court's review of the testimony of a second expert, somewhat vaguely

17   referenced by petitioner, demonstrates that Dr. Robert Anthony, a forensic pathologist, attested

18   on direct, inter alia, to the corrosive effects of bleach on the human body, including causing

19   erosion of the blood vessels, hemorrhaging of the esophagus and stomach; he referenced that the

20   effect of the fumes, chemical irritants attacking the lungs could cause the lungs to fill and heart

21   failure; he described that another way bleach could be fatal is by way of circulating in the blood

22   stream, attacking organ tissues and causing organ failure; he recounted how the direct chemical

23   effects of the bleach could cause very high sodium and chloride levels in the bloodstream,

24   throwing off an individual's metabolism and, if too high, causing coma, convulsions and death.

25   RT, vol. 2, pp. 306, 308-310.  Yet another way ingestion of bleach can cause death, according to

26   Dr. Anthony, is by throwing off the bloodstream's acid base balance, rendering a person

28

1   "profoundly acidic, which is, again, bad for the respiration, bad for the central nervous system,

2   and will cause the central nervous system to shut down and the person to die."   RT, vol. 2, p.

3   310.

4         Under cross-examination, Dr. Anthony conceded that he had not personally had a

5   bleach fatality, but that he had done "a fair amount of reading on the subject" and that there was a

6   fairly extensive amount of toxicological literature on fatal bleach ingestions, and that these cases

7   are suicidal, where disturbed persons don't have a weapon such as a gun or knife.   RT, vol. 2, pp.

8   312.   In such cases, it is unknown what precise amounts of bleach are ingested, according to Dr.

9   Anthony.   RT, vol. 2, pp. 312-313.   Dr. Anthony based his expert opinion on a reading of twenty-

10  four cases, but he also asserted in the cross-examination: "the material comes with warning

11  labels on it - - it is a well known irritant - - and it is not considered to be part of the usual diet, I

12  think that the Federal Government and most health organizations as well as the poison control

13  centers have a fair amount of experience in dealing with the material bleach."   RT, vol. 2, pp.

14  313-314.   He stated that he had not been able to unearth the lethal dose of bleach for fifty percent

15  of the population and did not believe it had been established for humans because such research

16  would be difficult to conduct ethically.   RT, vol. 2,  pp. 315-316.   Dr. Anthony testified, in

17  response to defense questioning about what effect a milk product like ice cream would have with

18  bleach:

19        A.  I don't think it's been specifically studied.  I would imagine
    that ice cream is a fatty product, and it usually stays in the stomach
20        a little longer than something simple like water.   So it would slow
    up the gastric emptying process.  So it would keep the bleach in the
21        stomach a little while longer before it would get passed on to the
    intestines.
22

23   RT, vol. 2, p. 318.

24        When petitioner's trial counsel then suggested that ice cream would neutralize

25  bleach in some manner, Dr. Anthony rejected that premise:

26        A.  You were suggesting that somehow the physical presentation of

> ice cream would somehow neutralize the chemicals that are present in the bleach.
>
> Q.  Right.
>
> A.  And I suggested that from the studies that we do have when people do ingest bleach, it doesn't get neutralized when it attacks the stomach.  It destroys the lining of the stomach, and that at autopsy the bleach fumes were reportedly smelled by the prosecutor, the person who actually did the autopsy.
>
> So if we are to speculate that human tissue is not going to, quote, neutralize it, then it doesn't seem any more reasonable to suppose that ice cream is going to neutralize it.

RT, vol. 2, p. 319.

While Dr. Anthony asserted under cross that there was no "hard and fast rule" as to how long bleach would remain corrosive upon ingestion, "the answer would be it remains corrosive as long as there are hypochlorite and sodium hydroxide molecules still around to attack the tissues of the body, and until all those get neutralized and reacted with, it will continue to do its work." RT, vol. 2, p. 321.  The cross-examination concluded:

> Q.  Yeah.  So if you have a solution of something that is basically a fat type of tissue that you have in ice cream, which is something like human flesh, and you mix them up, there is going to be a reaction going, right?
>
> A.  Again, I would have to go to a laboratory to run the test.  I don't really know.  I don't think anyone really knows.  I don't think anyone's really ever done that study.
>
> Q.  Okay.  So nobody rea[l]ly knows?
>
> A.  That's right.

RT, vol. 2, pp. 322.

It is difficult to decipher petitioner's point from his emphasis on testimony that seemingly harms his case.  Of course, at some level of dilution, chlorine will not kill or even harm a person.  After all, some water treatment systems use chlorine, and most of us have swallowed a little chlorinated water at a swimming pool.  The point to be gathered from the record as a whole, and one that the jury surely could have drawn, was that the severe reactions of petitioner's children caused by the concentrated bleach concoction had to be known to him, and the inference that petitioner knew he was serving a toxic substance at levels sure to cause life threatening harm cannot be avoided.  Jurors do not have to play dumb and leave all common

1   sense behind.  Even an individual devoid of common sense, with the most limited of cognitive

2   abilities and an utterly deficient education to the point of illiteracy – conditions or circumstances

3   with which petitioner does not claim to have been afflicted[12] – could argue a lack of awareness

4   that drinking bleach 24 times over an eight-day period in even a quasi-diluted form would be

5   extremely harmful to the health and potentially fatal, particularly to a five-year-old, the age of

6   Alexia at the time of her death.

7           Petitioner does not come close to meeting his burden to show that no reasonable

8   jury should have arrived at its conclusion, much less to demonstrate to this federal court that the

9   state appellate court not have affirmed the verdict under the Jackson standard in the absence of

10  an unreasonable determination.  Juan H. v. Allen, supra, 408 F.3d 1262.  After independently

11  reviewing the record, the court finds that the denial of this claim by the California Supreme Court

12  was not an unreasonable application of clearly established Supreme Court authority.

13  Accordingly, this claim should be denied.

14              C. Claim 3- Insufficient evidence of petitioner's intent to torture
                Jessica for a sadistic purpose to support a conviction of torture and
15              infliction of great bodily injury

16          Petitioner contends that insufficient evidence supported his conviction for torture

17  and for inflicting great bodily injury upon Jessica R. between June 1, 1997, and September 30,

18  1997, arguing that the evidence was not sufficient to show petitioner had the specific intent to

19  cause Jessica extreme pain and suffering for a sadistic purpose, but rather that his intent was to

20  rid her of demons.  Petition, pp. 16-17.  Petitioner does not dispute that trial evidence

21  demonstrated that petitioner and his wife forced Jessica to drink bleach three times a day for

22  eight days and that petitioner poured bleach on her while she was in a shed, but avers that there

23  was not substantial evidence that his actions were motivated by a sadistic purpose.  Id., at 17.

24  ───────────────

25      [12]  As the prosecution noted in closing argument: "There is no evidence whatsoever that
    would cause you to believe, and Mr. Lippsmeyer [petitioner's trial counsel] could have proven,
    for instance, that his client couldn't read or had the I.Q. of an imbecile and couldn't
26  comprehend."  RT 352-353.

1          Petitioner refers to Jessica's testimony about his and his wife's apparent belief in

2   demons and about a family road trip to Pennsylvania in June of 1997, the purported purpose of

3   which was to bring back Jessica's half-brothers because petitioner and his wife (their mother)

4   believed that the boys were under the care of a demon and that they could help keep the world

5   from being overtaken by demons and vampires, and that Jessica (and Alexia) were forced to

6   drink the bleach mixture after this trip.  Id., citing RT 84, 86-87, 90-94.

7          Petitioner cites Jessica's testimony as evidence presented supporting his

8   contention that petitioner and his wife continued to believe in demons when, on September 30,

9   1997, Jessica was made to sleep in a shed in the backyard because petitioner and his wife

10  believed Jessica was a demon who sucked electricity and that she was going to kill the baby

11  Jesus whom Jessica's mother was supposed to be carrying.  Id., citing RT 109, 222.  This is also

12  the occasion upon which petitioner poured bleach on Jessica as she slept.

13         For further support that petitioner's motivations arose from a belief in demons and

14  that Jessica was possessed by demons, petitioner points to the testimony of his mother-in-law,

15  Margaret R., his wife's (Barbara Carrasco's) mother.  Petition, pp. 17-18, citing RT 167.

16         In rejecting this claim, the state appellate court stated:

17         Defendant asserts insufficient evidence demonstrated he bore the
           specific intent to cause cruel or extreme pain upon Jessica "for a
18         sadistic purpose," an element of the crime of torture. He argues he
           lacked the required mens rea because, again, he intended to rid
19         Jessica of demons. We disagree.

20         Section 206 defines the crime of torture as follows: "Every person
           who, [1] with the intent to cause cruel or extreme pain and
21         suffering for the purpose of revenge, extortion, persuasion, or for
           any sadistic purpose, [2] inflicts great bodily injury as defined in
22         Section 12022.7 upon the person of another, is guilty of torture. [¶]
           The crime of torture does not require any proof that the victim
23         suffered pain." Defendant challenges the evidence relating only to
           his intent to cause pain for a sadistic purpose.
24
           Evidence of a defendant's state of mind is usually circumstantial.
25         Circumstantial evidence is as sufficient as direct evidence to
           support a conviction. (People v. Bloom (1989) 48 Cal.3d 1194,
26         1208, 259 Cal.Rptr. 669, 774 P.2d 698.)  Moreover, intent can be

established not only from the circumstances of the offense, but also from other, relevant circumstantial evidence. (People v. Raley (1992) 2 Cal.4th 870, 888-889, 8 Cal.Rptr.2d 678, 830 P.2d 712.) When the evidence, direct or circumstantial, is sufficient to justify a reasonable inference the requisite intent existed, we will not disturb the fact-finder's determination of that intent on appeal. ( People v. Bloom, supra, 48 Cal.3d at p. 1208, 259 Cal.Rptr. 669, 774 P.2d 698.)

Defendant argues the phrase "any sadistic purpose" in section 206 is interpreted similar to the intent requirement for a conviction of murder by torture under section 189 or a finding of a torture-murder special circumstance under section 190.2, subdivision (a)(18). The People correctly note murder by torture under section 189 and the special circumstance finding under section 190.2 require a finding of premeditation. A conviction under section 206 does not require willful, deliberate, and premeditated intent. (People v. Aguilar (1997) 58 Cal.App.4th 1196, 1206, 68 Cal.Rptr.2d 619.) This distinction, however, misses defendant's argument.

Defendant argues published opinions interpreting the phrase "any sadistic purpose" as used in the elements of torture-murder in the first degree and the torture-murder special circumstance are relevant to interpreting the phrase as used in section 206. Appellate courts agree. ( People v. Aguilar, supra, 58 Cal.App.4th at pp. 1202-1203, 68 Cal.Rptr.2d 619; People v. Barrera (1993) 14 Cal.App.4th 1555, 1564, 18 Cal.Rptr.2d 395.) We apply those interpretations here.

Thus, the phrase "any sadistic purpose," as used in section 206, "'is a term in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure.' ( Raley, supra, 2 Cal.4th at p. 901, 8 Cal.Rptr.2d 678, 830 P.2d 712.) We find it significant that the Supreme Court's statement does not include a specific reference to sexual pleasure. We also find significant the Supreme Court's notation of a recent definition of 'sadism' in Black's Law Dictionary (6th ed.1990) page 1336, column 1: 'A form of satisfaction, commonly sexual, derived from inflicting harm on another.' ( Raley, supra, 2 Cal.4th at p. 901, fn. 4, 8 Cal. Rptr.2d 678, 830 P.2d 712.) In our view, the Supreme Court in Raley clearly recognized that a 'sadistic purpose' need not be sexual in nature, and therefore did not so limit the meaning of 'sadistic purpose.' (See also People v. Healy (1993) 14 Cal.App.4th 1137, 1141-1142, 18 Cal.Rptr.2d 274 .)" ( People v. Aguilar, supra, 58 Cal.App.4th at p. 1203, 68 Cal.Rptr.2d 619.)

Sufficient evidence exists on this record to support a finding defendant inflicted cruel or extreme pain or suffering for *any* sadistic purpose. Defendant in effect argues he gave Jessica bleach

33

for her benefit. In reality, there can be little doubt from the evidence defendant derived some degree of perverse relief or pleasure from poisoning Jessica to rid *his* home and life of demons possessing her-hence, the almost ritualistic procession of forcing Jessica to drink the concoction three times a day until, finally, Alexia died from the drink.

Moreover, defendant's purpose went beyond ridding Jessica and him of demons. The record supports an inference he harmed Jessica simply because he did not like her and enjoyed seeing her suffer-hence, the sarcastic question when he doused her with bleach: "Do you like this?"

He also could have enjoyed punishing her for interfering with his efforts to give Alexia the bleach mixture. Jessica's attempts to save her younger sister's life would have thwarted defendant and Barbara's plan. They had to lock Jessica in her room in order to continue forcing Alexia to drink the bleach. Defendant and Barbara likely had not anticipated Jessica's heroic response.

Defendant saw Jessica vomit the bleach but still forced her to drink it. He saw Jessica try to save Alexia from the adverse effects of the bleach and separated Jessica so he could still administer the bleach. He saw Alexia unconscious on the floor and still forced Jessica to drink the bleach. He knew the mixture killed Alexia, but yet he still doused Jessica with bleach. If anything, these events warned him of the obvious danger to life he was creating. These facts imply he refused to stop administering the bleach even after witnessing these events because he experienced a degree of pleasure inflicting harm on the girls in this manner.

Sufficient evidence thus supports the finding defendant forced Jessica to drink bleach for a sadistic purpose.

Respondent's lodged doc. 3, Exh. A, state app. op., pp. 18-22 [emphasis in original].

Petitioner faults the state court appellate opinion for not addressing what he avers is the uncontradicted evidence that petitioner was motivated by a desire to rid the children of demons and not to inflict pain for his personal satisfaction or gain; he argues that the state court ignored case law stating that a reviewing court must consider the intent even if misguided, irrational and unjustifiable.  Petition, p. 18, citing People v. Wiley, 18 Cal.3d 162, 173, 133 Cal. Rptr. 135 (1976); People v. Davenport, 41 Cal.3d 247, 269, 221 Cal. Rptr. 794 (1985); People v. Steger, 16 Cal.3d 539, [546], 548, 128 Cal. Rptr. 161  (1976).

\\\\\

34

The undersigned is not going to engage in a critique of the appellate court on its

knowledge of California law.  That is not the purpose of habeas in federal court.  Moreover,

petitioner futilely clings to his demon defense, i.e., as long as one believes that his inhuman acts

serve a personal purpose of benefit to the torturer, in this case, ridding a person or house of

demons, he can utilize whatever brutal, callous means on human beings over a prolonged period

that he desires without having to worry about being accused of torture.  As the Court of Appeal

pointed out, *any* sadistic purpose will suffice for demonstrating torture, and the evidence is clear

that petitioner took personal satisfaction in acting on his alleged purpose.  The jury could

certainly infer, from the lack of any compassion shown to the girls after the forced drinking of

bleach, or the commands of petitioner that Jessica sleep in the bleach bath residue which he had

inflicted upon her that petitioner took a perverse pleasure in inflicting his harm.[13]

---

[13]  The trial record of this case includes Jessica's recounting of a particularly horrific episode one night which she testified on direct occurred some days after her mother forced her to sleep outside the house in a shed, some time after Alexia's death.  RT 105.
>
> Q.  Now, on the 30th of September, a few days later, did something unusual happen out in the shed?
> A.  Yes.
> Q.  What was it that was unusual that happened out in the shed?
> A.  Larry came out and poured bleach all over me while I was sleeping.
> Q.  Now, prior to that happening, do you remember any discussion?  Like do you remember anything that indicated to you that things were deteriorating again, things getting worse?
> A.  No.
> Q.  There was not a new discussion about demons or that you were an evil person?
> A.  No.
> Q.  There was not a new discussion about demons or that you were an evil person?
> A.  It was just the same old talk.
> Q.  Demons and vampires?
> A.  Yes.
> Q.  Talk that you were possessed by demons and vampires or just talk about demons and vampires in general?
> A.  Depended on what day it was if I was or if I wasn't or who was and who wasn't.
> Q.  Now, specifically on that night just before you went to bed, was there any discussion at all about you and demons and vampires, and if you were one of these or possessed by them or anything like

1        Moreover, as discussed previously, the evidence demonstrates that petitioner used

2   his brutal measure to enforce a type of discipline.

3        Following this court's independent review of the record, the court

4   finds that the denial of this claim by the California Supreme Court was not an unreasonable

5   application of clearly established Supreme Court authority.  Thus, this claim should be denied.

6   \\\\\

7   \\\\\

8   _____

9          that?
           A.  I don't remember.
10         Q.  So you are sleeping out there on that lawn chair I showed you
           the picture of, right?
11         A.  Yes.
           Q.  Then something happens.  You said Larry poured bleach all
12         over you?
           A.  Yes.
13         Q.  All right.  Tell me the first sensation what woke you up?  What
           was happening when you first woke up?
14         A.  My head got all wet.
           Q.  Could you smell anything?
15         A.  It smelled like bleach.
           Q.  Was it strong?
16         A.  Very strong.
           Q.  Were other parts of you also getting wet?
17         A.  Yes.  Because when I sat up, it just poured all down me.
           Q.  What were you wearing at that time?
18         A.  A t-shirt and some shorts.
           Q.  Were you under a blanket?
19         A.  Yes.  But when I sat up, the blanket came off.
           Q.  Could you hear a voice?
20         A.  Well, not until I said it was getting in my eyes.
           Q.  Then somebody said something?
21         A.  Yes.
           Q.  Who?
22         A.  Larry.
           Q.  What did he say to you?
23         A.  Do you like this or something to that effect.
           Q.  Was it said sarcastically or matter of factly or - -
24         A.  Sarcastically.
           Q.  Do you like this kind of thing?
25         A.  Yeah.
           Q.  And obviously you didn't?
26         A.  No.

36

D.  Claim 4 - <u>Prejudicial trial court error in instructing the jury on express malice (not charged), and by misinforming jury it could ignore the conscious disregard element of implied malice murder</u>

<u>Jury Instruction Error</u>

*Legal Standard*

A challenge to jury instructions does not generally state a federal constitutional claim.  <u>See</u> <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983); <u>see also</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475 (1981); <u>see also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  <u>Estelle v. McGuire</u>, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness."  <u>Id.</u> at 73, 112 S. Ct. at 482.  The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  <u>Id.</u> at 73, 112 S. Ct. at 482.

Where, as in the present case (at least in part), what is at issue is a failure to give an instruction, petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).

Furthermore, the Supreme Court has recently held that there is no unreasonable application of federal law where a state appellate court decided that a jury instruction's single incorrect statement of the "imperfect self-defense" standard did not render the instruction reasonably likely to have misled the jury.  <u>Middleton v. McNeil</u>, 541 U.S. 433, 124 S.Ct. 1830 (2004).

\\\\\

37

1    Where an instruction is ambiguous, the inquiry is "'whether there is a reasonable

2    likelihood that the jury has applied the challenged instruction in a way' that violates the

3    Constitution." Estelle, supra, at 72, 112 S. Ct. 475, quoting Boyde v. California, 494 U.S. 370,

4    380, 110 S. Ct. 1190, 1198 (1990).  "If so, we must decide 'whether the instruction, so

5    understood, was unconstitutional as applied to the defendant.'  Ho v. Carey, 332 F.3d 587, 592

6    (9th Cir. 2003), quoting Calderon v. Coleman, 525 U.S. 141,147, 119 S. Ct. 500 (1998).   Only

7    when an instruction is flatly erroneous, as opposed to merely ambiguous, is the "reasonable

8    likelihood" standard not applied.  Ho v. Carey, supra, 332 at 592.  "When a jury instruction omits

9    a necessary element of the crime, constitutional error has occurred."  Id.

10    Petitioner argues that he was charged with implied malice second degree murder

11    for the death of Alexia and contends that his due process rights were violated when the court did

12    not limit the jury instructions to implied malice murder but included instructions for express

13    malice, or first degree, murder.  Petition, p. 19.

14    In rejecting this claim, the state appellate court stated:

15    Defendant asserts the trial court committed prejudicial error by (1)
not instructing the jury with CALJIC Nos. 8.30 and 8.31; and (2)
allegedly removing the "conscious disregard" element from its

16    instructions on implied malice murder. We disagree.

17    The trial court instructed the jury using CALJIC Nos. 8.10
(murder-defined) and 8.11 (malice aforethought-defined). It did not

18    instruct with CALJIC Nos. 8.30 (unpremeditated murder of the
second degree) or 8.31 (second degree murder-killing resulting

19    from unlawful act dangerous to life). [FN1][14]

20

21    [14] [FN1] The pertinent versions of CALJIC Nos. 8.10 and 8.11 read by the court were:

22    "Every person who unlawfully kills a human being with malice aforethought, is guilty of
the crime of murder in violation of Section 187 of the Penal Code. [¶] In order to prove this
crime, each of the following elements must be proved:

23    "1. A human being was killed;
"2. The killing was unlawful; and

24    "3. The killing was done with malice aforethought...."
" 'Malice' may be either express or implied. [¶] Malice is implied when:

25    "1. The killing resulted from an intentional act;
"2. The natural consequences of the act are dangerous to human life; and

26    "3. The act was deliberately performed with knowledge of the danger to, and with

Defendant admits the instructions given by the court, CALJIC Nos. 8.10 and 8.11, "in concert lay out the elements of second degree implied malice murder...." However, he argues the instructions present theories of both express malice and implied malice to the jury. The defendant was prosecuted only on an implied malice theory. CALJIC Nos. 8.10 and 8.11 thus, he says, improperly allowed the jury to consider the theory of express malice murder.

He also claims CALJIC Nos. 8.10 and 8.11 improperly required the jury "to piece together" the elements of implied malice second degree murder by reading both instructions and synthesizing them for the charged crime. By contrast, CALJIC No. 8.31 by itself presented the elements of implied malice second degree murder.

We interpret instructions in support of the judgment if the instructions are reasonably susceptible to that interpretation. (People v. Laskiewicz (1986) 176 Cal.App.3d 1254, 1258, 222 Cal.Rptr. 686.) We must view the instructions as a whole, and assume the jurors were intelligent people capable of understanding and correlating all instructions given. (People v. Yoder (1979) 100 Cal.App.3d 333, 338, 161 Cal.Rptr. 35.) An error cannot be based upon an isolated phrase, sentence or passage of an instruction, unless as a whole it appears the language was prejudicial in light of all instructions given. (People v. Wingo (1973) 34 Cal.App.3d 974, 979, 110 Cal.Rptr. 448, overruled on other grounds in People v. Rist (1976) 16 Cal.3d 211, 222-223.)

---

conscious disregard for, human life.
    "When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.
    "The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.
    "The word 'aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

CALJIC Nos. 8.30 and 8.31 read as follows:

    "Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." (CALJIC No. 8.30 (6th ed.1996).)
    "Murder of the second degree is the unlawful killing of a human being when:
    "1. The killing resulted from an intentional act,
    "2. The natural consequences of the act are dangerous to human life, and
    "3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
    "When the killing is a direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (CALJIC No. 8.31 (6th ed.1996).)

> Nothing in the record affirmatively suggests CALJIC Nos. 8.10 and 8.11 may have misled the jury. We presume the jurors understood the instructions, applied the relevant portions concerning implied malice murder, and disregarded the rest. This is particularly likely since the prosecutor, in closing argument, stated express malice was not present in this case. Defendant admits CALJIC Nos. 8.10 and 8.11 presented all of the necessary elements of implied malice second degree murder. The instructions thus were not given in error.

Petition, Appendix A, State Appellate Opinion, pp. 12-15.

Petitioner in reiterating his argument herein argues that the state appellate court's reasoning is at odds with the observation of Francis v. Franklin, 471 U.S. 307, 322, 105 S. Ct. 196, 1975 (1985), that "[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." Petition, p. 20. He contends that superfluous instructions can distract jurors and finds the analysis faulty also for its reference to the prosecutor's closing argument because, he asserts, such argument is insufficient to cure an instructional error. Id., at 20-21.

The reference to "express malice" is limited to the "brief and passing mention of the term 'express malice' ... contained in the first sentence of CALJIC No. 8.11, wherein it is set forth as one of two types of malice." Answer, p. 27. While the court notes that there is another reference in that instruction to "express malice" at the point where it is stated: "[w]hen it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought," it is even a more passing reference.

> " 'Malice' may be either express or implied. [¶] Malice is implied when:
> "1. The killing resulted from an intentional act;
> "2. The natural consequences of the act are dangerous to human life; and
> "3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
> "When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.
> "The mental state constituting malice aforethought does not

40

1          necessarily require any ill will or hatred of the person killed.
           "The word 'aforethought' does not imply deliberation or the lapse
2          of considerable time. It only means that the required mental state
           must precede rather than follow the act."

3

4    CT 285-286; RT, vol. 2, p. 337.

5                 Moreover, the court observes that the instruction given to the jury explicitly

6    excises that portion of the instruction which defines express malice, and immediately follows the

7    introductory sentence in the standard CALJIC 8.11 jury instruction as set forth in the California

8    Jury Instructions: "Malice" may be either express or implied. [Malice is express when there is

9    manifested an intention unlawfully to kill a human being.]"

10                As to the prosecutor's comment to the jury – it is unequivocal:

11         First degree murder is the unlawful killing of a person plus malice
           aforethought, plus premeditation and deliberation.  I am telling you
12         right now, folks, this is not a first degree murder case.  There is no
           evidence of premeditation and deliberation, which basically means
13         that he planned to kill her; he thought it out; he figured out how he
           was going to do it; he took his time.  That is not here.  It's not here.
14         This is not a first degree murder case.  Forget first degree murder.
           You won't even get a verdict form for it.

15

16   RT, vol. 2, p. 351.

17                The prosecutor shortly thereafter also states:

18         Malice aforethought may be either express or implied.  Now,
           express malice - - I didn't put the definition up there because
19         express malice is I don't think present in this case.

20         Express malice is basically making it clear that you intend to kill
           somebody.  Walking up to somebody with a gun, pointing it in
21         their face saying I'm going to kill you and then pulling the trigger.
           That is express malice.  You have made a clear indication to
22         anybody there that you want to kill this person.

23         So what is implied malice, which, based on the evidence, is what
           we have here?
24
           The killing resulted from an intentional act.  The giving of bleach
25         is an intentional act.  Forcing the child to drink bleach was clearly
           intentional on his part.
26   CT, vol. 2, p. 352.

                                          41

1          Further, the state appellate court does not rely on the prosecutor's reference to

2  implied malice murder in the closing argument as the primary basis for its finding, only noting

3  that it made any juror confusion less likely.  Petitioner cited, inter alia, Wright v. United States,

4  339 F.2d 578, 580 (9th Cir. 1964), a case where a federal trial judge failed to comply with a

5  federal rule of criminal procedure by not fully responding to a defense counsel's request as to

6  which of counsel's requested instructions the court would accept, whereupon counsel made an

7  argument for which none of his requested instructions were subsequently provided to the jury, a

8  case inapposite to the issue herein.  As respondent observes, the jury's question concerning the

9  meaning of "conscious disregard for human life," discussed below, shows that the jury was

10  focused on "implied malice" in the context of a charge of second degree murder.  Answer, p. 28.

11          Petitioner also faults the trial court for, as he characterizes it, essentially informing

12  the jury that it could disregard the "conscious disregard for human life" element of implied

13  malice murder, the charge against petitioner for the death of Alexia.  Petition, p. 19.   Petitioner

14  cites the specific portion of the court record wherein the jurors posed the following question to

15  the court during their deliberations: "Please explain conscious disregard for human life."  CT

16  293.

17          The Court: I called you back, ladies and gentlemen, because I
             didn't quite understand the last question.
18          The last question was submitted to the court:
              "Please explain conscious disregard for human life."
19          Where in the law the phrases have a meaning such as reasonable
             doubt, I have provided you with definitions.  The phrase
20          "conscious disregard for human life" I have tried to see if that
             phrase itself has a definition.
21          Where a phrase doesn't in the law have a definition, words are
             given their common meaning.  So I need to know which word you
22          don't understand.
             Is it conscious?  Is it disregard?  Is it human?  Or is it life?  And I
23          will try to explain it to you, but basically each of the words is given
             its common meaning.
24          "Conscious" generally means to be aware versus unconscious.
             "Disregard," as I understand it, means to not care about or to
25          ignore.
             So I don't know whether this explanation in any way helps you.  I
26          have discussed this with the attorneys.  Each of them have done

42

1          some research to see if the phrase has a separate meaning from the
words in the phrase.  We haven't been able to find anything.  So
2          we're in a quandary to go beyond what I have just told you.

          ......................................................................................
3          Is it the phrase that you want to have some elaboration on, or is it
some of the words in the phrase?
4

5          Presiding Juror: I believe we know what it means.  I just think
some of the jurors had - - were undecided whether it pertains to
6          this case, you know.

7          The Court: Well, depending on what you find to be the facts, all
the instructions may or may not pertain to this case.  It is an
8          important consideration based upon your determination of the
facts.

9  RT, vol. 2, pp. 433-434.

10           Petitioner takes particular exception to the trial judge's response set forth

11  immediately above, contending that it permitted jurors to disregard an element of the crime.

12  Petition, p. 20.

13           In denying this claim, the state appellate court stated:

14          Defendant also claims the trial court improperly removed the
"conscious disregard" element from the implied malice
15          formulation. This allegedly occurred in the court's response to a
question from the jury during deliberations regarding the meaning
16          of the phrase "conscious disregard for human life." After
explaining the phrase's terms, the court asked if the jury wanted the
17          phrase's individual terms explained or the phrase as a whole
explained. The presiding juror stated they knew what the phrase
18          meant, but some of the jurors were undecided whether it applied to
this case. The trial court responded, "Well, depending on what you
19          find to be the facts, all the instructions may or may not pertain to
this case." [FN2][15]

20

21          [15] [FN2] The transcript records the relevant exchange between the court and the presiding
juror as follows:
22          "THE COURT: ... I called you back, ladies and gentlemen, because I didn't quite
understand the last question.
23          "The last question that was submitted to the court: [¶] 'Please explain conscious disregard
for human life.'
24          "Where in the law the phrases have a meaning such as reasonable doubt, I have provided
you with definitions. The phrase 'conscious disregard for human life' I have tried to see if that
25          phrase itself has a definition.
           "Where a phrase doesn't in the law have a definition, words are given their common
26          meaning. So I need to know which word you don't understand.

Defendant argues the court, by saying some instructions may not apply depending upon the facts, in effect instructed the jury to disregard the instruction on implied malice, i.e., the phrase "conscious disregard of human life." This left the jury without a definition of malice, the element disputed at trial. Defendant reads too much into the court's comment.

The trial court's comment did not leave the jury without a definition of malice. In the exchange, the presiding juror revealed the jury's question did not so much concern the meaning of the phrase, "conscious disregard of human life." Rather, the jury questioned whether that element of the implied malice instruction applied to this case. The court did not remove the definition of malice from their consideration. Rather, he simply reminded them the instructions for malice applied if the jury found facts warranting their use.

Obviously, the court could not respond directly to the presiding juror's question and announce the "conscious disregard" element of the test for implied malice applied or did not apply as a matter of law. It was for the jury to determine whether the facts demonstrated a conscious disregard of human life for purposes of determining the existence of malice. If the facts so demonstrated, the jury would then continue applying the instructed test to determine if implied

---

"Is it conscious? Is it disregard? Is it human? Or is it life? And I will try to explain it to you, but basically each of the words is given its common meaning.

"'Conscious' generally means to be aware versus unconscious.

"'Disregard,' as I understand it, means to not care about or to ignore.

"So I don't know whether this explanation in any way helps you. I have discussed this with the attorneys. Each of them have done some research to see if the phrase has a separate meaning from the words in the phrase. We haven't been able to find anything. So we're in a quandary to go beyond what I have just told you.

"Let me ask you, [presiding juror].

"PRESIDING JUROR: Yes.

"THE COURT: Is it the phrase that you want to have some elaboration on, or is it some of the words in the phrase?

"PRESIDING JUROR: I believe we know what it means. I just think that some of the jurors had-were undecided whether it pertains to this case, you know.

"THE COURT: *Well, depending on what you find to be the facts, all the instructions may or may not pertain to this case.* It is an important consideration based upon your determination of the facts.

"PRESIDING JUROR: Well[,] it ... pertains to this case. I just think they were undecided as to that count so --

"THE COURT: Okay. But, again, I don't know what was-what explanation 'conscious disregard for human life' what further I can give you.

"PRESIDING JUROR: I don't either.

"THE COURT: You have to apply the common meaning to each of the words there.

"PRESIDING JUROR: I think its fairly straightforward. I believe that we are ready to go ahead." (Italics added [in appellate court opinion].)

1   malice existed. If the facts did not so demonstrate, the instructions
2   on implied malice became irrelevant. Indeed, the jury had already
    been so instructed with CALJIC No. 17.31. [FN3][16] The court's
3   comment simply, and properly, reminded them of that counsel.

4   We conclude the trial court properly instructed the jury on implied
    malice second degree murder.

5   Petition, Appendix A, State Appellate Opinion, pp. 15-18.

6           Respondent is correct that petitioner misapprehends the trial judge's response.

7   Answer, p. 30.  Rather than suggesting that the "conscious disregard for human life" element (or

8   the intent or mens rea – mental state – element) could be discarded, the judge was essentially

9   informing jurors that if they did not find this element to be proven, then petitioner would have to

10  be acquitted of the charge.  Id.  As respondent notes, jurors had been instructed earlier that "[i]n

11  the crime charged in Count 1, namely murder, there must exist a union or joint operation of act or

12  conduct and a certain specific intent in the mind of the perpetrator.  Unless this specific intent

13  exists the crime to which it relates is not committed."  Answer, p. 30, quoting CT 285, from

14  CALJIC No. 3.31.5.  Respondent observes that this instruction was immediately followed by

15  CALJIC No. 8.10, which, as set forth supra, set forth the elements of murder, including a

16  reference to malice in general, and was followed by CALJIC No. 8.11, which set forth the

17  definition of malice, including the reference to conscious disregard of human life in particular.

18  Answer, pp. 30-31, CT 285-286.

19          This court's review of the instructions also demonstrates that the following

20  instruction was given:

21          The purpose of the Court's instructions is to provide you with the
            applicable law so that you may arrive at a just and lawful verdict.
22          Whether some instructions apply will depend upon what you find
            to be the facts.  Disregard any instructions which applies to facts

23

24          [16] [FN3] On this point, the court instructed the jury: "The purpose of the Court's
    instructions is to provide you with the applicable law so that you may arrive at a just and lawful
25  verdict. Whether some instructions apply will depend upon what you find to be the facts.
    Disregard any instructions which applies to facts determined by you not to exist. [¶] Do not
26  conclude that because an instruction has been given I am expressing an opinion as to the facts."

1     determined by you not to exist.

2  RT 422.

3        "A jury is presumed to follow its instructions.  Richardson v. Marsh, 481

4  U.S. 200, 211, 107 S.Ct. 1702, [] (1987).  Similarly, a jury is presumed to understand a judge's

5  answer to its question.  See, e.g., Armstrong v. Toler, 11 Wheat. 258, 279, 6 L.Ed. 468 (1826)

6  (opinion of Marshall, C. J.)."  Weeks v. Angelone, 528 US. 225, 234, 120 S. Ct. 727, 733 (2000);

7  U.S. v. Olano, 507 U.S. 725, 740, 113 S. Ct. 1770 (1993), quoting Richardson, supra, at 206, 107

8  S. Ct. at 1707, "[It is] the almost invariable assumption of the law that jurors follow their

9  instructions"); Tyler v. Cain, 533 U.S. 656, 659  n.1, 121 S. Ct. 2478 (2001) (noting that the

10  proper inquiry is whether there is a reasonable likelihood that the jury applied an instruction

11  unconstitutionally, citing Estelle v. McGuire, supra, 502 U.S. at 72, 112 S. Ct. 275).

12        After independently reviewing the record, the court finds that the denial of

13  petitioner's claims alleging jury instruction error by the California Supreme Court was not an

14  unreasonable application of clearly established Supreme Court authority.  Accordingly, these

15  claims should be denied.

16        E.  Claim 5 - Violation of petitioner's constitutional rights to trial
          by jury and due  process when jury instructed with CALJIC Nos.
17        1.00 and 17.41.1

18        Petitioner contends he was effectively denied his Sixth Amendment right to a jury

19  trial by the trial court's instruction to the jury pursuant to CALJIC No. 17. 41.1.  Petition, pp. 22-

20  28.  While he does not fully identify how CALJIC No. 1.00 violated his constitutional rights, as

21  respondent also observes (Answer, p. 33), he appears to argue that CALJIC No. 1.00 enhances

22  the allegedly deleterious impact of  CALJIC No. 17. 41.1.

23        That instruction, as given, provides:

24        The integrity of a trial requires that jurors, at all times during
          (their[17]) deliberations, conduct themselves as required by these

25

26        [17]  The Reporter's Transcript eliminates the pronoun "their."

46

> instructions.  Accordingly, should it occur that any juror refuses to
> deliberate or expresses an intention to disregard the law or to
> decide the case based on penalty or punishment, or any other
> improper basis, it is the obligation of the other jurors to
> immediately advise the court of the situation.

CT 290, RT 423-424.

Petitioner takes issue with CALJIC No. 1.00, which he has isolated to state: "You must accept and follow the law as I state it to you, regardless of whether you agree with the law." Petition, p. 22, CT 278, RT 325.

However, the instruction given to the jury based on CALJIC 1.00 (as respondent in part also notes at Answer, p. 31, n. 11), includes more than petitioner has set forth:

> You must accept and follow the law as I state it to you, regardless
> of whether you agree with the law. If anything concerning the law
> said by the attorneys in their arguments at any other time during the
> trial conflicts with my instructions on the law, you must follow my
> instructions.[18]

> You must not be influenced by pity for or prejudice against a
> defendant.  You must not be biased against a defendant because he
> has been arrested for this offense, charged with a crime, or brought
> to trial.  None of these circumstances is evidence of guilt[,] and
> you must not infer or assume from any or all of them that a
> defendant is more likely to be guilty than not guilty. [¶] You must
> not be influenced by sentiment, conjecture, sympathy, passion,
> prejudice, public opinion or public feeling.  Both the People and a
> [the] defendant have a right to expect that you will conscientiously
> consider and weigh the evidence, apply the law, and reach a just
> verdict regardless of the consequences.

CT 278, RT 325-326.[19]

Petitioner contends that CALJIC 17.41.1, apparently in concert with at least his limited version of what instruction was given based on CALJIC 1.00, gave jurors a false

---

[18]  This admonition (not referenced by petitioner) by the court does not undermine the reasoning by the state appellate court as to claim 4, because the prosecution was arguing his theory of the case and because the reference to "express malice" in the court's jury instructions did not actually provide a definition of express malice.

[19]  The bracketed material represents the differences that appear in the Reporter's Transcript, as compared to the text in the Clerk's Transcript.

1   impression that they were to police each other; prompted jurors to make use of extrinsic evidence

2   in making their determinations; and represented falsely that jurors would be subjected arbitrarily

3   to sanctions.  Petition, pp. 22-23.  CALJIC 17.41.1, according to petitioner, is a "coercive

4   instruction" depriving petitioner of his right to a jury trial and promoting the "stifling of free

5   deliberations by instilling fear of judicial interference and the publicizing of jurors['] views,"

6   thus promoting the rendering of a verdict based on evidence outside the record.  Petition, p. 23.

7          Citing United States  v. Thomas, 116 F.3d 606, (2nd Cir. 1997), petitioner argues

8   that "[t]he jury is supposed to reach its decisions in the mystery and security of secrecy."  Id.

9   He contends that "juror privacy is a prerequisite of free debate," that jurors must feel free to

10  engage fully in discussion without being hampered by a fear that their views could reach a larger

11  audience.  Id, at pp. 23-24.  Petitioner maintains that CALJIC No. 17.41.1 puts jurors on notice

12  that they could be subjected to judicial investigations based on an expression, or lack thereof, of

13  their views.  Id., at p. 24.  Petitioner believes that the combination of CALJIC Nos. 1.00 and

14  17.41.1 intimidates jurors from even considering jury nullification.  Id., at pp. 24-25.  Petitioner

15  quotes Blackstone at some length concerning the long ago abolished practice in England of

16  punishing jurors for "wrong" verdicts.  Id., at p. 25.  Petitioner recognizes that the California

17  Supreme Court has found CALJIC No. 17.41.1 not to be unconstitutional, People v. Engleman,

18  (2002), but points out that the state's high court recognized the potential of the instruction to

19  unnecessarily intrude and adversely affect the deliberative process.  Petition, pp. 25-26.

20         What petitioner does not do, however, is identify any way in which the verdict in

21  his own case may have been impacted by CALJIC 17.41.1d [sic] or simply did not want to incur

22  the possibility of reporting to and sanctioning by the trial court.

23         As petitioner himself has conceded, the California Supreme Court's July 2002

24  decision in People v. Engelman, 28 Cal. 4th 436 (2002) repudiates his claim.  The Engelman

25  court ruled that CALJIC 17.41.1 "does not infringe upon defendant's federal or state

26  constitutional right to trial by jury or his state constitutional right to a unanimous verdict," but

48

1  nonetheless directed trial courts to discontinue use of the instruction because of its potential to

2  intrude upon jury deliberations.  Id. at 439-40.

3          The Ninth Circuit thereafter ruled in Brewer v. Hall, 378 F.3d 952, 955-57 (9th

4  Cir. 2004) that a California Court of Appeal's reliance on Engelman to reject a constitutional

5  challenge to CALJIC 17.41.1 was, under AEDPA, "not contrary to or an unreasonable

6  application of clearly established Supreme Court precedent, because no Supreme Court case

7  establishes that an instruction such as CALJIC 17.41.1 violates an existing constitutional right."

8  Brewer controls in the instant case.

9          Accordingly, petitioner is not entitled to relief based upon his claim he was denied

10 his Sixth Amendment right to a jury trial by the trial court's instruction pursuant to CALJIC No.

11 17. 41.1 and to CALJIC No. 1.

12          Following an independent review of the record, the court finds that the denial of

13 petitioner's claims alleging jury instruction error by the California Supreme Court was not an

14 unreasonable application of clearly established Supreme Court authority.  Therefore, these claims

15 should be denied.

16          F.  Claim 6 - Constitutional right to fair trial violated

17          Petitioner argues that he was deprived of due process and his right to a fair trial by

18 the cumulative effect of the errors he has set forth in claims 1 through 5.  Petition, pp. 29-30.

19 Respondent argues that petitioner cannot demonstrate that he has been deprived of his Sixth

20 Amendment right to a fair trial by relying on a claim of cumulative error, where no prejudicial

21 constitutional errors have accumulated.  Answer, pp. 33-34.

22          Cumulative error is applicable where "no single trial error examined in isolation

23 is sufficiently prejudicial to warrant reversal...," but their cumulative effect has still prejudiced

24 defendant/petitioner.  Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000); see also,

25 Davis v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004) ("although individual errors may not rise to

26 the level of a constitutional violation, a collection of errors might violate a defendant's

1   constitutional rights").

2        In <u>Beardslee v. Woodford</u>, 358 F.3d 560, 591 (9th Cir. 2004), the Ninth Circuit

3   found in a trial record which evidenced multiple constitutional violations, each of which were

4   found to be harmless individually, even when aggregated still fell "short of causing a substantial

5   impact on the verdict or the denial of a fundamentally fair trial."  In this case, petitioner has not

6   demonstrated any error that rises to the level of a constitutional violation.  Where petitioner has

7   failed to demonstrate that he has been deprived of any federal constitutional right by the state,

8   petitioner cannot demonstrate that the cumulative effect of alleged errors entitles him to habeas

9   corpus relief.  <u>Windham v. Merkle</u>, 163 F.3d 1092, 1107 (9th Cir.  1998); <u>see</u> <u>also</u>, <u>Rupe v.</u>

10  <u>Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996) (where no violation of federal rights is set forth, "there

11  is no reason to reverse for cumulative error.")

12       Following an independent review of the record, the court finds that the denial of

13  petitioner's claim alleging a denial, based on cumulative error, of his constitutional right to a fair

14  trial by the California Supreme Court was not an unreasonable application of clearly established

15  Supreme Court authority.  Therefore, this claim should be denied.

16       G.  Claim 7 - <u>Ineffective assistance of appellate counsel</u>

17       Similarly, this court having found that petitioner has not shown that the denial of

18  any of his claims by the state supreme court was an unreasonable application of clearly

19  established Supreme Court authority, including a claim of ineffective assistance of trial counsel,

20  he is unable to show the requisite prejudice for an ineffective assistance of appellate counsel

21  claim for appellate counsel's failure to raise claims 1, 5, and 6 herein (which petitioner merely

22  references by Roman numeral, without re-stating each claim).  Petition, p. 30; Answer, pp. 17,

23  22-23.  <u>See</u> <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 484, 120 S. Ct. 1029 (2000) (presuming

24  prejudice only when "counsel's deficient performance actually cause[d] the forfeiture of the

25  defendant's appeal").

26  \\\\\

1        Because the court has found that petitioner has not raised any meritorious ground

2  in this habeas petition, appellate counsel could not have been ineffective for not raising any such

3  ground.

4        The court finds that the denial of petitioner's claim alleging ineffective assistance

5  of appellate counsel by the California Supreme Court was not an unreasonable application of

6  clearly established Supreme Court authority.  This claim should be denied.

7        Accordingly, IT IS HEREBY RECOMMENDED that the petition be denied.

8        These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: 12/6/07

17                      /s/ Gregory G. Hollows

18                      GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

19  GGH:009
carr1313.fr

20

21

22

23

24

25

26

51